Morris E. Floyd and J. W. Floyd, also known as Jane W. Floyd v. Commissioner. Floyd and Company, Inc. v. Commissioner.
Floyd v. Commissioner
Docket Nos. 49815, 49816.
United States Tax Court
T.C. Memo 1955-209; 1955 Tax Ct. Memo LEXIS 129; 14 T.C.M. (CCH) 835; T.C.M. (RIA) 55209; July 26, 1955
*129 Petitioners purchased for $11,000 certain property which was being leased to a corporation which they controlled. The corporation had previously been given an opportunity to purchase the property and had rejected the offer. Held, the corporation furnished no part of the consideration for the purchase and the transaction did not result in the receipt of taxable income by the petitioners. Robert M. Willan, Esq., and Charles F. Hartsock, Esq., Carew Tower, Cincinnati, Ohio, for the petitioners. John C. Calhoun, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of Morris E. and Jane W. Floyd (hereinafter referred to collectively as petitioners) for the year 1949 in the amount of $22,809.44, and in the income tax of Floyd and Company, Inc., for the years 1949 and 1950 in the amounts of $1,673.46 and $653.56, respectively. Floyd and Company has conceded its liability for the deficiencies as determined. Petitioners also agree to respondent's determination increasing the amount of rental income received in 1949. The only issue for decision is whether the Commissioner erred in *130 holding that petitioners received taxable income in the amount of $42,850 from Floyd and Company in 1949 when they purchased certain property which was under lease to Floyd and Company. Findings of Fact Petitioners are husband and wife and reside in Cincinnati, Ohio. They filed a joint income tax return for the calendar year 1949 and Floyd and Company filed corporate income tax returns for the years 1949 and 1950 with the collector of internal revenue for the first district of Ohio. Floyd and Company was organized in 1945 to act as a wholesale distributor of general appliances. In 1949 Morris E. Floyd (hereinafter referred to as Floyd) owned 4,100 shares and his wife owned 500 shares of the 5,000 shares of Floyd and Company stock outstanding. There were four other stockholders each owning 100 shares. All of the stockholders were members of the board of directors, and Floyd was the company's president. In February 1946 Floyd and Company entered into a contract with the Cincinnati Gas and Electric Company (hereinafter referred to as the Gas Company). In consideration for Floyd and Company becoming the distributor in the Cincinnati area for the gas refrigerator and gas-fired air *131 conditioning unit manufactured by the Servel Company, the Gas Company agreed to rent to Floyd and Company the first floor of the building at 1616 Madison Road in Cincinnati for a period of five years at $50 per month and agreed to expend $25,000 per year in advertising the above appliances for a period of five years, making the advertisements appear as if they were run and paid for by Floyd and Company. The contract was embodied in correspondence between the presidents of the two companies. On April 4, 1946 the Gas Company as lessor and Floyd and Company as lessee executed a lease with respect to the premises at 1616 Madison Road. Among other things the lease provided: "10. The Lessee shall have the privilege of renewing this lease for an additional five (5) year period at the same terms and on the same conditions as those of the original lease. "11. If during the term of this lease or any extension thereto the Lessor desires to sell the property at 1616 Madison Road it will afford to the Lessee an opportunity to make an offer for the property before entertaining any other offers." As the result of discussions in the summer of 1948 between Floyd and the vicepresident and general *132 manager of the Gas Company, Ernest S. Fields (hereinafter referred to as Fields), the latter offered to sell the property at 1616 Madison Road to Floyd and Company for $19,000. This offer was rejected by the board of directors of Floyd and Company on September 14, 1948, on the ground that the company would gain no real advantage from the purchase of the property. One of the principal considerations in declining the offer was the greatly increased need for working capital which would result from a contract then being negotiated by Floyd and Company to distribute the Bendix washing machine. The board of directors resolved that the Gas Company should be notified that Floyd and Company did not desire to purchase the property and that the Gas Company was free to offer the same to any other person, firm or corporation. On October 12, 1948 a further conference was held between Floyd and Fields. At that conference Fields on behalf of the Gas Company agreed to sell to Floyd, individually, the premises at 1616 Madison Road for $19,000. It was also agreed at that conference that an oral contract would be substituted for the written contract of February 1946 wherein the Gas Company had agreed *133 to expend $25,000 per year for a period of five years in advertising Servel products for which Floyd and Company was the local distributor. Floyd agreed to the substitution in order to accommodate the Gas Company which was finding the advertising subsidy to Floyd and Company embarrassing in its relationships with the Public Utilities Commission of Ohio. Thereafter, throughout the remainder of the five-year period, the Gas Company continued to spend approximately $25,000 per year in advertising the Servel products for Floyd and Company, but it began paying the bills direct in order to avoid the appearance of a subsidy. The Gas Company executed a deed to the property at 1616 Madison Road on November 24, 1948, conveying the property to the individual petitioners jointly. The closing of the transaction was delayed, however, until the property could be released from a blanket mortgage covering all of the Gas Company's property. Around December 15, 1948 it was discovered that the joists were moving out of the walls of the building at 1616 Madison Road. An inspection by the Building Commissioner disclosed that the walls were bulging and leaning toward the east and that part of the roof *134 rafters were a little off their supports. He concluded that the walls were unsafe and would have to be braced or, if that did not work, they would have to be rebuilt. He suggested that Floyd engage an engineering contractor named Witte. On December 30, 1948, the Building Commissioner wrote the Gas Company informing it of the faulty condition of the walls and roof, suggesting a possible method of correcting the condition, and directing the Gas Company to submit a plan for making the building safe. Floyd employed Witte to inspect the building and to make an estimate of the cost of putting the building in first class condition and correcting the structural defects. Thinking that it would be necessary to replace the east and west walls of the building, Witte submitted an estimate dated January 5, 1949 in the amount of $33,440. The Gas Company also had structural engineers investigate the walls. They estimated that the expense of rectifying the condition would be more than the cost of the building on the books of the Gas Company. About January 28, 1949, a conference was held between Floyd and Fields of the Gas Company. Fields agreed to reduce the price of the building from $19,000 to *135 $11,000 and Floyd agreed to release the Gas Company from any possible warranties as to the condition of the building. Floyd paid the full $11,000 by personal check at that time. The Gas Company confirmed the arrangement by letter dated January 31, 1949. The deed which had been executed on November 24, 1948 was delivered and was recorded on February 19, 1949. Around the first of February 1949 Floyd called Witte to discuss repairing the building. Witte had heard of the inspection which the Building Commissioner had made. Subsequent to rendering his estimate Witte had consulted the Building Commissioner and had found that the latter would be amenable to bracing the walls rather than replacing them. Witte informed Floyd of this and told him that if he could work out a plan which was acceptable to the Building Commissioner he would submit another estimate. Witte worked out a plan for bracing the walls and applied for a permit on February 7, 1949. The permit was accepted and Floyd told Witte to go ahead with the work. The repairs were completed in March 1949 and cost $1,629.27. Witte refused to guarantee the repairs as there was always a chance that bracing would not rectify the condition. *136 Subsequently there was no further movement in the walls, and eventually it was assumed that the repairs were permanent. Floyd and Company did not furnish any part of the consideration for the purchase of the property at 1616 Madison Road by petitioner. The statutory notice of deficiency to petitioners states: "It is held that in the year 1949 you received income in the aggregate sum of $42,850.00 from your controlled corporation, Floyd and Company, Inc., which released to the Cincinnati Gas and Electric Company, but in your favor: (a) Privilege to purchase property for $11,000.00 (b) Release of advertising commitments at $25,000.00 per year." Opinion In 1949 the individual petitioners purchased from the Gas Company for $11,000 a building which was then being leased to Floyd and Company. Respondent determined that $11,000 was not the true purchase price, but that Floyd and Company, which was controlled by the petitioners, furnished additional consideration by releasing the Gas Company from its contractual obligation to expend $25,000 per year in advertising Servel products for which Floyd and Company was the local distributor. Respondent determined that the additional *137 consideration furnished by Floyd and Company and the waiver by Floyd and Company of its right to purchase the property for itself constituted a taxable distribution to petitioners in the amount of $42,850. Petitioners contest this determination. Petitioners concede that they are taxable on any consideration for the purchase of the property which was furnished by Floyd and Company. They contend, however, that the Gas Company's advertising commitment was not cancelled and that Floyd and Company furnished no part of the purchase price. We agree. In the first place the Gas Company offered to sell the property for $19,000 both before and after the conference of October 18, 1948 at which the advertising commitment was discussed and allegedly cancelled. In the second place Floyd's testimony that the advertising commitment was not cancelled but was merely changed from a written to an oral contract, is amply supported by the subsequent conduct of the parties to that contract; and we disagree with respondent's contention that Floyd's testimony should not be believed. Respondent also determined that the waiver by Floyd and Company of its right to purchase the property constituted a distribution *138 to petitioners, but in his brief respondent has offered no explanation for this holding. The facts are briefly as follows. The lease between the Gas Company and Floyd and Company provided that if during the term of the lease the Gas Company desired to sell the property it would afford Floyd and Company an opportunity to make an offer for the property before entertaining any other offers. The Gas Company offered to sell the building to Floyd and Company for $19,000. The board of directors of Floyd and Company, because they were contemplating taking on the Bendix washer and needed working capital and because they saw no real advantage in the purchase, rejected the offer on September 14, 1948. This left the Gas Company free to offer the property to any other person, firm or corporation, and Floyd contracted on October 18, 1948 to purchase the building for $19,000. The price was later reduced to $11,000 because the walls were found to be defective. By declining to purchase the premises for $19,000 Floyd and Company did not bestow a property right upon petitioners, and regardless of whether petitioners made a good bargain, the transaction did not include a taxable distribution of income. *139 Furthermore, respondent concedes on brief that the Gas Company "intended to receive, and did receive, adequate consideration for the property." We have found that all of the consideration was furnished by Floyd. Petitioners did not realize taxable income by purchasing property at arm's length for an adequate consideration. Decisions will be entered under Rule 50.